**2011 BNH 001**      Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                                                             Chapter 11

KS Realty, Inc. and                                                                   Bk. No. 09-10918-JMD
Pointe Luck, LLC,                                                                    Bk. No. 09-10919-JMD
            Debtors                                                                        Jointly Administered

*Robert J. Keach, Esq.*
*Jennifer Rood, Esq.*
*Bernstein, Shur, Sawyer & Nelson*
*Portland, ME and Manchester, NH*
*Attorneys for Debtor*

*John M. Sullivan, Esq.*
*Joshua E. Menard, Esq.*
*Preti Flaherty PLLP*
*Concord, NH*
*Attorneys for Maxfield Real Estate, Inc.*

## MEMORANDUM OPINION

### I.  INTRODUCTION

KS Realty, Inc. and Pointe Luck, LLC, jointly administered debtors (collectively, the "Debtors"), object to the proof of claim ("POC 11" or the "Claim") filed by Maxfield Real Estate, Inc. ("Maxfield") (Doc. No. 230) (the "Objection").  Maxfield asserts a claim for $584,000 based on its alleged entitlement to a commission from the post-confirmation sale of the Debtors' Grand View Commons subdivision property located in Wolfeboro, New Hampshire (the "Property").  The Court held an evidentiary hearing on the Objection and took the matter under advisement.  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the

United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. FACTS

Maxfield and the Debtors entered into an Exclusive Listing Agreement (the "Agreement") dated July 2, 2007, with respect to the Property, which the parties extended through January 15, 2009.  The Agreement stated in relevant part:

> If during the term of this Agreement, an individual or entity is procured who is ready, willing and able to purchase at said price, or upon another price and terms to which SELLER may agree, the SELLER agrees to pay AGENCY a commission of 5% to 6% of the contract price . . . . Upon full execution of a contract for sale and purchase of the PROPERTY, all rights and obligations of this Agreement will extend with respect to such Purchase and Sales Agreement and Deposit Receipt through the date of closing as specified in the Purchase and Sales Agreement and Deposit Receipt. . . . The commission as provided above shall be due if the PROPERTY is contracted to be or has been sold, leased, conveyed, exchanged or otherwise transferred within 6 months after the expiration or rescission of this Agreement to anyone with whom the Agency has procured, unless the PROPERTY has been listed with another licensed broker on an exclusive basis.  "Procurement" shall include, but not be limited to, providing information about the PROPERTY, showing the PROPERTY, or presenting offers on the PROPERTY.

Under the Agreement the amount of the commission depended upon the nature of the lot being sold.  The Agreement further authorized Maxfield to share its commission on an equal basis with licensed brokers and agents from other real estate firms.  It also provided that Maxfield would be entitled to payment of fifty percent of any deposit forfeited by a defaulting buyer.

Maxfield and its co-broker, Yankee Pedlar Realtors ("Yankee Pedlar"), procured a buyer for the Property.  On September 15, 2008, the Debtors entered into a purchase and sale agreement for the Property (the "2008 P&S") at a purchase price of $14,150,000 with JWM Generations Trust (the "Buyer" or "Marriott").  Pursuant to the 2008 P&S, the Buyer paid a deposit of $1,000,000 (the "Deposit").  The 2008 P&S did not have a set closing date; rather, it

called for a closing no later than fifteen days after completion of a due diligence period. The 2008 P&S called for a forty-five day due diligence period, which could be extended an additional thirty days.

On November 25, 2008, within the due diligence period, the Buyer terminated the 2008 P&S. The Debtors contended that the termination was unilateral and without cause. Marriott contended that the termination was permissible under section 5(c) of the 2008 P&S, which provided in relevant part:

> In the event that Buyer shall determine in Buyer's sole and absolute judgment and discretion, that the Property is in any manner unsuitable or unsatisfactory to Buyer, Buyer shall have the right, at the Buyer's option, to terminate this Agreement by giving written notice thereof to Seller on or before the expiration of the Due Diligence Period, in which event ONE HUNDRED AND NO/100 DOLLARS ($100.00) of the Earnest Money shall be delivered to the Seller as consideration for Seller's execution of and entry into this Agreement, the balance of the Earnest Money shall be refunded to Buyer immediately upon request, all rights and obligations of the parties under this Agreement shall expire, and this Agreement shall become null and void.

The 2008 P&S provided that if the Buyer defaulted, the Debtors could recover the Deposit. Maxfield would have been entitled to half the Deposit, or $500,000, as a professional fee. The Deposit was not recovered by the Debtors or Maxfield at that time.

In early 2009, the Debtors commenced litigation in state court (the "Marriott Litigation") asserting several causes of action against the Buyer and its trustee: Count I for breach of contract by the Buyer, Count II for breach of the covenant of good faith and fair dealing by the Buyer, Count III for violation of RSA c. 358-A by the Buyer, and Count IV for prima facie tort by the Buyer's trustee. The Debtors sought an award of damages plus interest, costs, and fees; the Debtors did not seek specific performance of the 2008 P&S in the state court suit. The Debtors contended that the Buyer's purported termination was ineffective and without cause. Shortly

thereafter, on March 23, 2009, the Debtors filed bankruptcy; they removed the state court litigation to this Court on June 19, 2009, and it became an adversary proceeding.

During the course of the Debtors' bankruptcy case they retained and employed a new real estate broker, Prudential Spencer-Hughes Real Estate ("Prudential"), to market the Property under an exclusive listing agreement that was in effect from April 15, 2009, to October 23, 2009. With court approval, the agreement was ultimately extended through January 31, 2010.

The Debtors filed their first plan of reorganization and disclosure statement on June 22, 2009. It incorrectly indicated that the Debtors were seeking specific performance of the 2008 P&S in the Marriott Litigation. This inaccuracy was repeated in the Debtors' second plan and disclosure statement filed with the Court on August 10, 2009, as well as the third plan and disclosure statement filed with the Court on October 26, 2009. The Court confirmed the Debtors' third plan of reorganization, as amended, on December 10, 2009. The confirmed plan provided for payments to creditors to be funded from sales of lots of the Property and from any recovery from post-confirmation causes of action, including the Marriott Litigation.

On December 10, 2009, the Court also approved a sale of lot 33 of the Property to Winter Harbor Holdings, LLC for a price of $1,520,000. Marriott objected to the sale of lot 33 and indicated that Marriott had previously made an offer to purchase the entire Property for $10,000,000, which offer had been rejected by the Debtors. The purchase and sales agreement for lot 33 contained no provision for the payment of a broker's commission to either Maxfield, Yankee Pedlar, or Prudential, and no broker asserted any claim for a commission with the Court with respect to that sale.

Post-confirmation, the Debtors and Marriott resolved their differences. The parties executed another purchase and sales agreement dated March 17, 2010 (the "2010 P&S") with a

4

stated purchase price of $14,100,000. The 2010 P&S differed from the 2008 P&S in the following ways:

1. The payment terms changed from a cash sale to a partial installment sale for more than $4,000,000 of the purchase price, which would be secured by a note and mortgage on certain designated lots;

2. The total face value of the purchase price was lowered by $50,000;

3. The Deposit already being held in escrow was being surrendered and was to constitute a portion of the purchase price;

4. $7,000,000 in cash was being transferred as part of the purchase price;

5. The closing date was changed to a date certain instead of being based on the performance of due diligence as set forth in the 2008 P&S;

6. The 2010 P&S did not include any due diligence condition or period whatsoever nor any other conditions precedent;

7. A requirement was added that the buyer pay the prorated share of all real estate taxes and other such liens;

8. A provision was added permitting the principal of the Debtors to store items in the airport hangar and insure those items;

9. A requirement was added that the buyer pay certain closing costs;

10. The requirement that the seller obtain estoppel certificates as a condition to closing was removed;

11. The provision identifying Maxfield and Yankee Pedlar as brokers was removed and a provision stating that Marriott had no liability to them was added;

12. A provision was added requiring the seller to repurchase lot 33 of the Property, using a portion of the purchase price, so that it could be transferred to the buyer;

13. The required deliverables were reduced;

14. A release provision was added releasing the parties from any claims raised or which could have been raised in the litigation between them;

15. Certain representations and warranties were removed; and

16. A provision was added requiring bankruptcy court approval of the sale.

On March 16, 2010, the Debtors filed a motion for an expedited hearing to clarify, or amend, their confirmed plan to approve the proposed sale to Marriott. After a hearing, the Court determined that Court approval of the proposed sale was unnecessary and inappropriate under the terms of the confirmed plan of reorganization. On March 18, 2010, the Court entered an order clarifying that a sale of all the remaining lots of the Property to one buyer was not inconsistent with the confirmed plan and that no plan provision prohibited the sale of all the remaining lots to one buyer.

A sale of the Property for $14,100,000 closed on March 19, 2010. A sale in that amount would have generated a commission pursuant to the Agreement in the amount of $584,000, which would have been shared equally by Maxfield and Yankee Pedlar. Neither Maxfield nor Yankee Pedlar received any commission from the sale of the Property.

In connection with the sale of the Property, the Debtors also sought approval of a settlement of the Marriott Litigation. Like the Debtors' plans and disclosures statements, the settlement motion incorrectly stated that the Debtors sought specific performance of the 2008 P&S in the Marriott Litigation. The Debtors indicated:

> The Sale of real estate to Marriott gives the Reorganized Debtors all the relief requested in the adversary complaint, i.e. specific performance, at essentially the same price as the 2008 sales contract, in an uncertain real estate market, without the costs and risks of continued litigation. The proceeds of the Marriott sale permit the Reorganized Debtors to satisfy all their obligations to their lender, removing the risk associated with trying to sell lots piecemeal in order to meet the benchmarks set forth in the Settlement Agreement with Ocean Bank and Meredith Village Savings Bank. The Marriot[t] sale also permits Debtors to make distributions to unsecured creditors on an expedited basis and removes the risk of default.

The Court approved the settlement after a hearing and ordered dismissal of the adversary proceeding with prejudice.

On March 31, 2010, Maxfield and Yankee Pedlar filed a joint motion seeking permission to file a late proof of claim under Federal Rules of Bankruptcy Procedure 3003 and 9006. The deadline for filing claims in the Debtors' bankruptcy case was July 21, 2009. After a hearing, the Court granted the motion, reserving any ruling on notice and timeliness issues. In accordance with the Court's order, Maxfield filed the Claim on June 1, 2010. The Debtors filed the Objection on June 28, 2010. A two-day hearing on the merits took place in August 2010.

## III. DISCUSSION

In ruling on the Objection, the Court is faced with two issues: (1) whether Maxfield had legal grounds to file POC 11 late; and (2) if so, whether Maxfield's Claim is an allowable claim. Without deciding whether Maxfield had legal grounds to file a late proof of claim, the Court shall address whether the Claim is allowable.

### A. Claims Allowance

> Sections 501 and 502 govern the filing and allowance of creditor claims in bankruptcy proceedings. . . . When a debtor files for relief, each creditor is entitled to file a proof of claim against the debtor's estate pursuant to § 501. Once a creditor has filed such a proof, the bankruptcy court must determine whether the claim is "allowed." Section 502(a) provides that a proof of claim filed under § 501 is deemed allowed unless a party in interest (often the trustee) objects. However, even where a party in interest objects, the court "shall allow" the claim unless one of nine exceptions enumerated in § 502(b) applies.

Am. Express Bank, FSB v. Askenaizer (In re Plourde), 418 B.R. 495, 502-03 (B.A.P. 1st Cir. 2009) (footnotes and citations omitted). Section 502(b) provides:

> Except as provided in [various subsections] of this section, if such objection to claim is made, the court, after notice and a hearing, shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that–

7

>(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;
>
>. . .
>
>(9) proof of such claim is not timely filed . . . .

11 U.S.C. § 502(b).

A timely filed and properly supported proof of claim is initially presumed valid; however, a debtor or trustee may rebut such presumption by coming forward with substantial evidence in opposition to it. Plourde, 418 B.R. at 504. If the objecting party presents substantial evidence, the claimant generally has the burden of proving its claim by a preponderance of the evidence. Id.; see also Notinger v. Auto Shine Car Wash Sys., Inc. (In re Campano), 293 B.R. 281, 285 (D.N.H. 2003) ("[I]t is ultimately 'for the claimant to prove his claim, not for the objector to disprove it.'"); In re Plourde, 397 B.R. 207, 216 (Bankr. D.N.H. 2008) ("Generally, a creditor seeking to establish a claim under state law has the burden of proof."). The United States Supreme Court has further explained that state law governs the substance of claims in bankruptcy, and the substance of a claim includes its burden of proof. Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 20-21 (2000); see also Campano, 293 B.R. at 285-86 (citing Raleigh). Under New Hampshire state law, a broker seeking a commission must establish its claim by a preponderance of the evidence. See Blais v. Remillard, 138 N.H. 608, 611 (1994) ("[T]he plaintiff must present sufficient evidence to satisfy the burden of proof such that a reasonable jury could find in her favor."). For that reason, Maxfield has the burden of establishing its entitlement to a commission under the facts of this case.

### B. Maxfield's Entitlement to a Commission

"A real estate broker's entitlement to a commission is based upon its agency agreement with the seller of the property." Coldwell Banker v. Pauson, 138 N.H. 666, 668 (1994). Where

8

an agency agreement exists, "[a] real estate broker is entitled to a commission if the broker procures a buyer who is ready, willing, and able to purchase the property to be sold upon the terms proposed by or acceptable to the seller." Blais, 138 N.H. at 610; see also Pauson, 138 N.H. at 669; Bell v. Warren Dev. Corp., 114 N.H. 267, 268 (1974); Philbrick v. Chase, 95 N.H. 82, 84 (1948); Parker v. Estabrooke, 68 N.H. 349 (1895). "The broker's duty is performed when the minds of the parties meet on an agreed price and terms of sale; the sale need not be completed in order for the broker to earn the commission where the failure to close is due to the seller rather than of the buyer." Blais, 138 N.H. at 610 (emphasis added); see also Dunn v. Staples, 109 N.H. 251, 254 (1968) (ruling broker was not entitled to a commission, when husband refused to sell under certain conditions even though the buyers were "willing and able" to purchase the property, since buyers were not willing to buy on terms reasonably acceptable to the sellers).

Maxfield and the Debtors agree that the Agreement is the controlling document that outlines the rights and obligations of Maxfield and the Debtors.[1] It also is undisputed that Maxfield and/or Yankee Pedlar procured Marriott as a buyer for the Property and that the Debtors and Marriott executed the 2008 P&S on September 15, 2008, within the exclusive listing period under the Agreement. The Agreement provided:

> Upon full execution of a contract for sale and purchase of the PROPERTY, all rights and obligations of this Agreement will extend with respect to such Purchase and Sales Agreement and Deposit Receipt through the date of closing as specified in the Purchase and Sales Agreement and Deposit Receipt.

Maxfield contends that the Agreement is clear that the right of commission extends through the closing of the 2008 P&S even if the Agreement has expired. The 2008 P&S provided in section

---

[1] At trial, Maxfield indicated that its Claim was based only upon its alleged entitlement to a commission and not any entitlement to a portion of the Deposit.

9

4 that the closing was to occur no later than fifteen days after the expiration of the due diligence period. Pursuant to section 5(c) of the 2008 P&S, Marriott had an initial period of forty-five days to conduct due diligence, with an option to extend the due diligence period an additional thirty days. Accordingly, it appears that the closing of the 2008 P&S was to occur no later than December 14, 2008.[2]

The 2008 P&S did not close by December 14, 2008. Rather, on November 25, 2008, Marriott gave written notice pursuant to section 5(c) of the 2008 P&S that the Buyer was electing to terminate the 2008 P&S, effective upon the expiration of the due diligence period. The 2008 P&S provided in section 12 that the Buyer's obligation to consummate the purchase and sale of the Property on the closing date was subject to the condition that the "Buyer shall not have terminated this Agreement pursuant to an express right so to terminate set forth in this Agreement." This section of the Agreement also provided that the Buyer could "terminate this Agreement by giving written notice to the Seller on or before the Closing Date, in which event all rights and obligations of Seller and Buyer under this Agreement shall expire, and this Agreement shall become null and void" if the Buyer previously had terminated the Agreement.

It is apparent to the Court that Marriott considered the 2008 P&S terminated, effective November 29, 2008, pursuant to section 5(c) of the 2008 P&S, which gave the Buyer the right to terminate the Agreement if the Buyer determined the Property to be unsuitable or unsatisfactory. As of the end of November 2008, Marriott was not a "ready, willing, and able buyer" within the meaning of that term under New Hampshire law. Marriott remained unwilling to purchase the Property through January 15, 2009, the end of the of the exclusive period under the Agreement,

---

[2] The Agreement was executed on September 15, 2008, resulting in an initial forty-five-day due diligence period through October 30, 2008, an extended thirty-day due diligence period through November 29, 2008, and a closing no later than fifteen days later, or December 14, 2008.

and through July 15, 2009, the end of the six-month protection period under the Agreement. The Debtors recognized this fact and brought suit seeking damages for breach of contract, for breach of the covenant of good faith and fair dealing, and for violation of RSA c. 358-A.

While the Debtors were in bankruptcy, after the Agreement's six-month protection period had expired, and after the Debtors had retained a new broker,[3] Marriott again expressed interest in purchasing the Property. Marriott filed an objection to the sale of lot 33 in October 2009, wherein Marriott indicated that it had made an offer to purchase the entire Property for $10,000,000, which offer was rejected by the Debtors. This is evidence that Maxfield did not obtain a "ready, willing, and able buyer" for the Debtors during the term of the Agreement or its six-month protection period. The New Hampshire Supreme Court has indicated that "if the terms proposed by the prospective purchaser vary in any material degree from those specified or accepted by the seller, the brokers have failed to fulfill the obligations they undertook and are not entitled to a commission." Bell, 114 N.H. at 268.

Only after the sale of lot 33 was consummated, and the Debtors' plan of reorganization was confirmed in December 2009, did Marriott and the Debtors resolve their differences and negotiate the 2010 P&S. Maxfield contends that the terms of the 2010 P&S were essentially the same as the terms of the 2008 P&S and, therefore, a closing of the 2010 P&S was essentially a closing of the 2008 P&S, entitling it to a commission under the Agreement. In support of its

---

[3] Before the end of the six-month protection period under the Agreement, the Debtors, with court approval, retained Prudential as a new real estate broker who had an exclusive agreement to list the Property from April 15, 2009, through January 31, 2010. The Court notes that the Agreement provided that "[t]he commission [due to Maxfield] as provided above shall be due if the PROPERTY is contracted to be or has been sold, leased, conveyed, exchanged or otherwise transferred within 6 months after the expiration or rescission of this Agreement to anyone with whom the Agency has procured, unless the PROPERTY has been listed with another licensed broker on an exclusive basis" (emphasis added). Here, the Property was listed with another broker on an exclusive basis after the Agreement with Maxfield expired.

position, Maxfield cites to the case of Finlay v. Frederick, 135 N.H. 482 (1992).  In Finlay, the court held that the broker procured a ready, willing, and able buyer for commercial property and, thus, was entitled to a commission under the listing agreement where the broker informed the buyer of the property and led the buyer to the seller, and the buyer's principals purchased the property on terms nearly identical to terms previously negotiated by the broker.  The broker had procured the buyer who made an offer that was ultimately rejected by the seller.  Approximately thirty days later, during a period when the listing agreement was still in effect between the seller and the broker, the buyer contacted the seller directly, and the two parties, without the knowledge of the broker, entered into a five-year lease for the property with an exclusive right to purchase the property within three years.  Two years later, the buyer executed the right to purchase the property.  The court found that the listing agreement was in effect when the option to purchase was given, and because the option was subsequently exercised, the broker was entitled to a commission on the sale regardless of whether the option was exercised after termination of the agreement.  The court held that broker had met its duty to procure a willing and able buyer since the buyer ultimately purchased the property for terms that were essentially the same as the rejected offer.  Maxfield contends this case provides a basis for the Court to conclude that Maxfield should also be entitled to a commission upon the sale of the Property in 2010.

In the Court's view, there is a major difference between the facts of Finlay and the facts of this case.  In Finlay, the parties executed the lease and option agreement during the exclusive period of the listing agreement, and it was pursuant to that agreement that the sale closed.  In this case, the sale of the Property did not close pursuant to the 2008 P&S but rather pursuant to the 2010 P&S, which was executed long after the expiration of the Agreement.  Maxfield argues that

12

the 2010 P&S is simply an amendment or an extension of the 2008 P&S as the essential elements of the 2008 P&S never changed, i.e., the agreement was for the "same price, same parties and same property." The Court disagrees that the terms of the agreements are essentially the same. As outlined above, there were at least sixteen differences between the two agreements. Maxfield itself acknowledges that there are differences and that the differences are "a reflection of the change of circumstances between the parties." Maxfield fails to recognize, however, that these changes in circumstances, i.e., the termination of the 2008 P&S, the state court suit, the Debtors' bankruptcy filings, the hiring of a new real estate broker, the new offer by Marriott to purchase the Property, the sale of lot 33, and the confirmation of the Debtors' plan, are what support the Debtors' contention that Marriott and the Debtors negotiated a new deal in the winter of 2010.

The Court finds the case of <u>Coldwell Banker v. Pauson</u>, 138 N.H. 666 (1994), to be more instructive than <u>Finlay</u>. In <u>Pauson</u>, the broker had entered into an exclusive listing agreement with the sellers in January 1991. The agreement expired in April 1991 and contained a ninety-day protection period. During the month of January, the broker introduced the buyers to the sellers. The buyers and sellers made several offers and counter-offers but none was ever accepted before the sellers took their home off the market and signed a form terminating the listing agreement. In July 1991, the buyers contacted the sellers and indicated they were still interested in buying the sellers' home should the sellers ever desire to sell. In December 1991, the sellers contacted the buyers and indicated they were again interested in selling their home. In March 1992, the buyers purchased the sellers' home. The broker brought suit claiming a right to a commission. The court held the provisions in the listing agreement made clear that the broker was to be paid a commission (1) where a sale of the property or an agreement resulting in a sale of the property was achieved before the listing agreement expired, or (2) if a sale of the property

13

was achieved within ninety days of the expiration of the listing, the sale was to a person either introduced to the seller or negotiated with by the broker during the term of the agreement. Because the sale in Pauson was neither accomplished nor agreed upon until well after the ninety-day protection period had expired, the court held that the broker was not entitled to a commission. The court stated that ""[w]here a definite time is specified in the listing agreement, the broker is entitled to a commission only if he achieves the result within the time specified." Pauson, 138 N.H. at 669.

The Agreement in this case makes clear that Maxfield was to be paid a commission where a sale of the Property, or an agreement resulting in the sale of the Property, was achieved before the Agreement expired or within six months of the expiration of the Agreement, if the sale was to anyone Maxfield had procured. In addition, Maxfield's right to a commission would extend through the closing of the 2008 P&S even if the Agreement had expired. In this case, the sale of the Property for $14,100,000, upon which Maxfield bases its claim, was neither accomplished nor agreed upon until well after the six-month protection period expired on July 15, 2009, and the sale did not close by December 14, 2008, the closing date set forth in the 2008 P&S.

Maxfield has made much of the fact that the Debtors represented to the Court in various pleadings that the Marriott Litigation involved a request for specific performance of the 2008 P&S. Representations by the Debtors, that they were seeking specific performance in the Marriott Litigation, does not make it so. And, even if the Debtors were seeking specific performance, such a request does not negate the fact that Marriott treated the 2008 P&S as terminated (a position the Buyer was entitled to take under the terms of the 2008 P&S) and, therefore, he was no longer a "ready, willing, and able buyer," which would preclude the

payment of a commission to Maxfield.  See Allard & Geary, Inc. v. Faro, 122 N.H. 573, 576 (1982) (holding that the realtors were not entitled to a commission because they failed to produce a ready, willing, and able buyer by the date specified in the agreement, as extended).

Because Maxfield failed to produce a purchaser who was ready, willing, and able to buy in accordance with the terms authorized by the Debtors as set forth in the Agreement and the 2008 P&S, Maxfield was not entitled to a commission under the Agreement.

**IV.  CONCLUSION**

Pursuant to New Hampshire law, because the 2008 P&S did not close by the deadline set forth in the agreement nor by July 15, 2009, the end of the six-month protection period under the Agreement, Maxfield is not entitled to any commission under the Agreement.  For that reason, the Claim is unenforceable against the Debtors and property of the Debtors and shall be disallowed under § 502(b)(1).  Consistent with this opinion, the Court will issue a separate order sustaining the Debtors' Objection and disallowing the Claim.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:   January 5, 2011                         /s/ J. Michael Deasy
                                                J. Michael Deasy
                                                Bankruptcy Judge